IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| AMY E. KIMBERLING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:23-cv-1806 |
| | § | |
| IMPACT MHC MANAGEMENT, LLC, | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT

Amy E. Kimberling, a/k/a Aimee Kimberling ("Amy," "Kimberling," or "Plaintiff") complains of her former employer, Impact MHC Management, LLC, seeking damages and injunctive relief due to retaliation in violation of 42 U.S.C. §2000e-3(a).

### PARTIES

1.  Kimberling is a Texas resident.

2.  Impact MHC Management, LLC (referred to herein as "Impact" or "Defendant") is a Colorado limited liability company. It can be notified of this lawsuit by serving the company's registered agent for service of process in Texas, which is Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

### JURISDICTION AND VENUE

3.  This Court has jurisdiction over the federal claim asserted herein pursuant to 28 U.S.C. § 1331.

4.  Defendant owns and operates several manufactured housing communities in Texas, and it does a substantial amount of business in Texas. Defendant therefore has sufficient

1

minimum contacts with the State of Texas to allow this Court to exercise personal jurisdiction over the Defendant in this case.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Venue is also proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein occurred in the State of Texas, and because Kimberling would have continued to work in Dallas County (and other counties which comprise the Dallas Division) if not for the unlawful employment practices complained of herein.

### RELEVANT FACTS

6. Impact owns and operates mobile home communities in multiple states, including several in Texas.

7. Kimberling began working for Impact in 2018 doing special projects involving multiple communities in several states, such as renovations and expansions of existing communities. During her first 19-20 months of employment, Impact disguised her $110,000 annual salary as payment to a third-party independent contractor, but in reality she was an employee. Kimberling reported directly to Dave Reynolds, the CEO of the company.

8. Scott Pistorius was a Regional Vice President over the Texas and Oklahoma region, and some of the special projects Kimberling worked on required her to coordinate with Pistorius. Although she did not report to Pistorius, he tried to control her work, and he told her not to communicate with her boss (Reynolds) about anything, but instead to go through him. Pistorius also made Kimberling do things that were not her job, such as writing up and firing employees.

9. Kimberling quickly grew tired of being micromanaged and treated as a subordinate, and on one occasion she refused to write up an employee at the request of Pistorius. After this incident, Pistorius began to bully and harass Kimberling.

10. Pistorius started calling Kimberling sweetheart, in person and over the phone. It then escalated to text messages, which became more frequent and more inappropriate. Pistorius was demanding and controlling, and he insisted that Kimberling must always answer his calls and not let them go to voicemail. Pistorius began telling Kimberling what clothes to wear to events and meetings. Kimberling told him to stop calling her sweetheart, to which he responded, "what are you going to do about it?"

11. Pistorius told Kimberling he wanted to run for a position on the board of directors of the Texas Manufactured Housing Association. Kimberling had been active in the association for years, and she had attended hundreds of meetings and events, whereas Pistorius was a total newcomer. Kimberling tried to explain it was premature for him to run for a seat on the board, but Pistorius grew irate and threatened to have Kimberling fired if she did not help him.

12. Kimberling came to learn that it was not just her, Pistorius also bullied and harassed his female subordinates, including a District Manager in Texas named Ann Rubio. Kimberling and Ann Rubio sometimes discussed Pistorius, and they commiserated over the mistreatment they were both being subjected to.

13. In 2019, Kimberling flew to Kansas to assist Pistorius at his request. Pistorius picked her up from the airport, and they stopped at a restaurant for dinner before going to their hotel. During dinner, Pistorius reached under the table and put his hand on Kimberling's leg. This conduct was unwelcome and completely uninvited. Kimberling moved his hand away, and

3

Pistorius said "don't embarrass me sweetheart." When they reached the hotel, Amy learned that Pistorius had booked only one room for them. Fortunately, she was able to get her own room.

14. Pistorius continued to make sexual advances, and at one point he sent Kimberling a naked picture of himself by text message. As the bullying and sexual harassment grew worse, it began taking a toll on Kimberling. She felt powerless, she was so stressed that her hair began to fall out, and she sought assistance from a health-care professional.

15. On or about February 1, 2020, Kimberling and Ann Rubio spoke by phone and once again discussed Pistorius. Rubio was crying and upset because of something Pistorius had done or said, and Kimberling suspected Pistorius was probably making sexual advances and treating Rubio the same way Pistorius treated Kimberling. To confirm if her suspicions were correct, and to let Rubio know she wasn't alone, so she forwarded the naked text/picture, and she asked Rubio if this is what she too was dealing with, because it's what Pistorius was doing to Kimberling.

16. After this call, Rubio called one of the company's Human Resources employees, Renee Poutre. Rubio told Poutre about the call with Kimberling, the text/picture she sent, and some of the problems they were having with Pistorius.

17. Poutre then spoke to Pistorius, who said he'd been having a consensual relationship with Kimberling. Pistorius then called Kimberling, and after some yelling, he said he had talked to Poutre and that Kimberling should expect a call from Poutre.

18. Kimberling spoke to Poutre a few days later. Kimberling explained she was not having an affair with Pistorius. Kimberling said Pistorius had a history of sending her inappropriate text messages, and propositioning her.

19. A few days later, HR began an investigation. On February 6, 2020, Poutre drafted a letter to Kimberling that said at the top: "Notice of Investigation of Claims." The letter stated: "This letter is to confirm the investigation into your allegations that Scott Pistorius acted inappropriately." Poutre told Kimberling she had to go to Des Moines, Iowa to meet with an attorney the company hired to investigate. In a subsequent email, Poutre told Kimberling: "Our intention is to investigate a claim of harassment." Poutre also said that Pistorius had been placed on administrative leave.

20. Kimberling met with the company's attorney in Des Moines on February 19, 2020. She answered the attorney's questions, she provided the information she had regarding the sexual harassment that she experienced first-hand, and the sexual harassment of others that she was aware of. At all times, before, during, and after this meeting, Amy participated and cooperated with Impact's investigation into alleged violations of Title VII by Impact's officer and employee, Scott Pistorius.

21. Because of her cooperation and opposition to violations of the law, Impact retaliated against her.

22. Although Pistorius was allegedly on leave, he was still participating in virtual meetings and conference calls, and he continued to send and receive work-related emails. Kimberling, however, began to see that she was being excluded from calls and emails. Furthermore, she was told not to communicate with her immediate supervisor, Dave Reynolds, and not to travel, which was a necessary and important part of her job.

23. On February 14, 2020, Kimberling sent an email to Poutre about these developments. Poutre replied and confirmed that Pistorius should not be on calls, he was only

supposed to communicate with her, Dave Reynolds, and Todd Burget. Poutre did not, however, dispute Kimberling's statement that Pistorius was violating the terms of his administrative leave.

24. On March 9, 2020, Renee sent Kimberling a notice saying their attorney had finished her investigation. Impact's lawyer concluded there was no basis for allegations of sexual harassment by Pistorius. Pistorius celebrated his exoneration by sending bouquets to Poutre and another HR employee.

25. Thereafter, Impact took even more actions that adversely affected Kimberling's employment. Pistorius took away Kimberling's responsibility for ordering new mobile homes for the expansion of a community in Lumberton, Texas, and he told the vendors to disregard the requests for price quotes Kimberling had already sent them. Pistorius also interfered with an issue concerning an invoice from a vendor doing some work at the Lumberton location for the expansion. In an email, Pistorius told Kimberling he would assign it to Villa-Riordan to handle.

26. Kimberling replied to the email from Pistorius objecting to his meddling with her responsibilities, which she had been assigned by the company CEO, for the expansion project. She pointed out that Villa-Riordan had never handled an expansion project before, adding that the Lumberton expansion was her project, and she intended to see it through.

27. Poutre responded by telling Kimberling not to email Pistorius directly. She told Kimberling that Impact was "working to assign you to new properties outside of the [Pistorius] region." It seemed to Kimberling that Poutre was supporting Pistorius, whose actions could be seen as retaliatory, but punishing her by taking away projects she was proud of and heavily invested in.

28. Right around this same time, Poutre started questioning Kimberling's credit card charges year to date, requiring Kimberling to provide her with receipts for all of the charges.

This was unusual because it had never happened before, and also because Poutre had no operational role when it came to processing expense reimbursements. Impact also lowered Kimberling's card limit from $50,000 to $10,000.

29. Meanwhile, COVID-19 cases began to be reported in Texas. While the pandemic caused financial hardship for many business and industries, manufactured housing communities generally thrive during economic downturns as people seek to cut expenses and find more affordable housing.

30. On April 1, 2020, Poutre sent an email to Amy with "a listing of additional projects available for you to start." Most were menial administrative tasks, like creating a spreadsheet, and helping to update training materials. The letter also informed Amy she would now be reporting to Todd Burget instead of Dave Reynolds.

31. The change of supervisors, and the other changes to her duties, left Amy uncertain about her role and her future with the company. On April 2, 2020, Kimberling sent an email to Reynolds asking whether she should continue working on one of her Texas projects. Reynolds dodged the question and told her to discuss it with Todd Burget. Burget told her to focus on something else; finalizing titles for some previously-purchased homes. This was an administrative task that fell outside the scope of Kimberling's job.

32. All of the changes and uncertainty prompted Kimberling to send an email to Poutre on April 16, 2020, complaining that Pistorius was making a hostile working environment for her.

33. Meanwhile, Kimberling continued to do her job to the best of her ability. In mid-April 2020, Kimberling was seeking a zoning variance from the city of Lumberton in connection with the expansion of the community that Kimberling was overseeing. The city had to post a

7

notice about any proposed variance in the newspaper a certain number of days before the city council could meet to vote on it.  A city official told Amy she needed the paperwork no later than April 16, 2020 in order to get the notice posted in time to allow the variance to be considered at the next city council meeting.  Kimberling planned to go to Lumberton to meet with two contractors working on the expansion project, and she rented a car so she could deliver the necessary paperwork to the Lumberton city official.

34. Todd Burget told her not to go.  Kimberling therefore sent an email on April 17, 2020 email to Todd Burget in which Kimberling asked about all the changes being made to her job lately, and she asked, what is my job now?  Burget's replied telling her to devote 100% of her time to the title issue mentioned above.  This email confirmed all of Kimberling's former duties had been stripped, leaving her only with processing paperwork.

35. On April 20, 2020, Kimberling sent an email to Poutre with a subject line: "Retaliation."  In this email, Kimberling listed her concerns about the retaliatory actions taken against her because of her participation in and cooperation with the investigation of Pistorius.

36. On April 24, 2020, Impact terminated Kimberling's employment.

37. On October 21, 2020, Kimberling filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

38. On May 15, 2023 the EEOC issued a Notice of Right to Sue.

39. Plaintiff has therefore exhausted her administrative remedies.

### FIRST CAUSE OF ACTION – RETALIATION

40. At all times relevant to this case, Impact was an employer and Kimberling was an employee as those terms are defined by Title VII.

41. Kimberling opposed what she reasonably (both subjectively and objectively) believed to be violations of Title VII, *i.e.* sexual harassment by Impact's officer and employee, Scott Pistorius. Her opposition to these unlawful actions included her reporting of information and her participation in and cooperation with Impact's investigation into the allegations of sexual harassment by Pistorius.

42. Because Kimberling opposed these unlawful acts, Impact retaliated against her by excluding her from meetings and communications, by stripping her job duties away and assigning her to administrative duties, and ultimately firing her. These actions were things that would dissuade a reasonable person from making or supporting a charge of discrimination.

43. Impact's actions violated the anti-retaliation provisions in Title VII, 42 U.S.C. §2000e-3(a).

44. Impact's retaliation caused both economic harm in the form of lost income and benefits, and non-economic harm such as suffering, mental anguish, inconvenience, loss of personal status and dignity, loss of enjoyment of life, and other damages. Plaintiff is also entitled to attorneys' fees, expert witness fees, and costs incurred in connection with these claims.

45. Impact's unlawful retaliatory acts were committed with malice or reckless indifference to Plaintiff's federally protected rights. Plaintiff is therefore entitled to, and hereby seeks, punitive damages.

### INJUNCTIVE RELIEF

46. Impact intentionally engaged in unlawful employment practices prohibited by Title VII. Plaintiff therefore asks this Court to enjoin Impact from engaging in such unlawful employment practices, and to order affirmative relief, such as reinstatement of Kimberling and

other adversely affected and displaced employees, with back pay, and other equitable relief as this Court deems appropriate.

47.     Kimberling requests an award of injunctive relief ordering Impact to reinstate her to the position she held at the time of her termination in 2020, with back pay and full restoration of all seniority and benefits of employment.

### ATTORNEY FEES, EXPERT WITNESS FEES, AND COSTS

48.     Plaintiff requests an award of reasonable attorney fees, expert witness fees, and costs of court.

### JURY DEMAND

49.     Plaintiff demands a trial by jury on all claims asserted in this Complaint for which a trial by jury is allowed by law.

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

a. Judgment finding that the unlawful actions described in this Complaint constitute violations of Title VII;

b. Judgment enjoining Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages described in this Complaint;

c. Judgment awarding Plaintiff all compensable damages, including all economic losses, lost past and future income and benefits of employment, and compensatory damages such as suffering, mental anguish, inconvenience, loss of personal status and dignity, and loss of enjoyment of life;

d.  Judgment awarding all costs of court, expert witness fees, and attorney fees recoverable by law;

e.  Judgment awarding punitive damages;

f.  Judgment awarding such other relief under Title VII to which Plaintiff is entitled by law;

g.  Judgment awarding all pre-judgment and post-judgment interest to which Plaintiff is entitled by law;

h.  Judgment awarding all other and further relief to which Plaintiff is entitled.

    Respectfully submitted

    /s/ Donald E. Uloth
    Donald E. Uloth
    Law Office of Donald E. Uloth
    Texas Bar No. 20374200
    18208 Preston Rd. Suite D-9 # 261
    Dallas, Texas 75252
    Phone: (214) 989-4396
    Email: don.uloth@uloth.pro
    Counsel for Plaintiff